# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF MISSISSIPPI
# DELTA DIVISION

ANN AVERY CLINTON,                                                    PLAINTIFF,

VS.                                                  CIVIL ACTION NO. 2:06CV38-P-A

DATASCOPE CORP.,                                                      DEFENDANT.

## MEMORANDUM OPINION

This matter comes before the court upon Defendant's Motion for Summary Judgment [44-1]. After due consideration of the motion and the responses filed thereto, the court is prepared to rule.

## I. FACTUAL BACKGROUND

The plaintiff, Ann Avery Clinton, filed the instant employment discrimination action on March 8, 2006 against her former employer Datascope Corp. alleging she was terminated on June 30, 2005 because of her age and gender. She alleges that Datascope discriminated against her in favor of a younger, 31-year-old male named Maurice Hampton.

Clinton began working for Datascope on February 15, 2001 when she was 54 years old. David Yacu, then an Area Manager, hired the plaintiff as a Territory Manager and sales representative of certain medical devices to designated hospitals and physicians' offices located in West Tennessee, North Mississippi and a small part of Arkansas. Eventually her territory ranged from Paducah, Kentucy and Southern Missouri to Greenville, Mississippi.

Clinton as a Territory Manager headed her sales team comprised of herself and two clinical education specialists ("Clinicals"): Maurice Hampton, hired in August 2003; and Kevin Springer. As the head of the sales team, Clinton covered the entire territory and the two Clinicals split the north and the south halves of the territory. When hired, Hampton was approximately 30 years old

1

Although Hampton had experience as a technician at Memphis Heartlines and for the catheter lab and surgery departments at Baptist East Hospital and Methodist Hospital in Memphis, he had no previous sales experience.

On March 1, 2004, the division in which Clinton worked – Datascope's Interventional Products Division ("IPD") – announced a reorganization of all its territories. Before this reorganization there were 40 territories within the IPD and every territory had a Territory Manager and at least one Clinical. After the reorganization, there were 72 territories and the job classification of Clinical was eliminated. Datascope laid off approximately 30 Clinicals and promoted the remaining Clinicals to the sales position of Territory Representative, each with an assigned sales territory.

With regard to Clinton's sales team, Datascope laid off Springer and promoted Hampton to a Territory Representative. According to the deposition of Yacu, who was once Clinton's Area Manager but was later promoted to Zone Manager in October 2001, the territories were all treated the same: one Clinical was laid off and the retained Clinical became the Territory Representative for the geographic area he or she had serviced as a Clinical prior to the Reorganization. The incumbent Territory Manager, in this case Clinton, took over the portion of the territory that had been serviced by the laid-off Clinical, in this case Springer. According to Stephen Davis, Clinton's Area Manager after Yacu was promoted, this was done because the Territory Manager was responsible for managing the entire territory and was required to have a working knowledge of and relationship with every account; whereas, the newly promoted Clinicals, in this case Hampton, only had knowledge of the portion of the territory he had serviced prior to the reorganization.

Thus, Clinton was given the northern part of the territory that had been Springer's and

Hampton was given the southern portion of the territory he had serviced as a Clinical. The accounts in Memphis were split between Hampton and Clinton: Hampton received the Methodist Hospital System and Clinton received Baptist Hospital East. Hampton had serviced all of Memphis as a Clinical. According to the defendant, Hampton was also given Jackson, Mississippi, which was new to the territory, because he had grown up in that area and had attended college there. Davis avers that they did not assign Hampton to any accounts that had been serviced by Springer and that he and Yacu were responsible for dividing Clinton's territory whereby Yacu drew the geographic boundaires and Davis filled in the account data.

Thus, after the reorganization in March 2004, Hampton was given Greenville, Clarksdale, Jackson, Meridian, Vicksburg and the entire Methodist Hospital in Memphis. Clinton was given Tupelo, Oxford, Columbus, Greenwood, one hospital in Memphis (Baptist East) and areas north including Paducah, Kentucky and part of Missouri.

The plaintiff alleges that from the moment she saw the division of the accounts, she knew that Yacu was trying set her up for failure because she believed Yacu had "cherry picked" all the good accounts for Hampton. Clinton alleges further that Yacu favored Hampton over her because he was younger, male, and had been a football player. Furthermore, Clinton alleges that Datascope in general favors youthful salespeople over those older.

Clinton argues that her new territory was clearly inferior to that given to Hampton. She alleges that her new territory prevented the possibility of growth since some of her accounts had major problems with Datascope's product and would never use them again, most of the accounts were already heavily saturated with prior deals with Datascope, former Clinical Kevin Springer had been "bad-mouthing" the company at some of his former accounts, and the plaintiff's territory was

3

so spread out that it would be difficult to completely cover the area without a Clinical. Hampton, on the other hand, according to the plaintiff, was given low quotas with many hospitals with no prior business and plenty of room to make excellent numbers. Furthermore, although Clinton was given one hospital in Memphis, Baptist East, Hampton was given the entire Methodist Hospital System in Memphis even though it was separated by three hours from the rest of his territory. The plaintiff also states that Hampton got the three areas with the highest concentration of doctors: Memphis, Jackson, and Meridian.

While discussing the impact of the reorganization in relation to the plaintiff, Zone Manager Yacu admits that Area Manager Davis told him that Clinton would not be happy with her share of the territory. Davis states that Yacu responded that the realignment would stay as it is and that "at her age she should be thankful to have the job." Hampton alleges that Yacu said "this would probably be the last stop for her."

At the time of the reorganization in March 2004, John Koutroubis became Area Manager. When the reorganization was announced, Clinton told Koutroubis that there must have been a mistake or that someone did not understand the territories. According to Yacu, Koutroubis was new and did not understand what was going on with regard to the reorganization. The plaintiff states that Koutroubis told her to lay our her argument in an email, and when she did, Koutroubis forwarded it to Yacu who responded to the email. In his response, Yacu stated that Clinton was responsible for her own sales and was also required to coach Hampton, who had no prior sales experience. According to Clinton, Yacu raised her quota after her complaint as a veiled threat.

Clinton expressed further dissatisfaction with her territory and quotas to Koutroubis and Davis, informing them that it was extremely difficult to meet her quotas in the new territory. She

4

states that she "pleaded for that whole year." Maurice Hampton states that he told Clinton he would give her some of his accounts or swap out with her to equalize their territories.

Shortly after he joined the company as Vice President of Sales in October 2005, some seven months was after the reorganizatoin, Sean McNerney came to Memphis to have dinner with Clinton and Hampton. During the dinner, Clinton and Hampton proposed that McNerney help them equalize their territories. Clinton avers that her area manager, Koutroubis, encouraged her to bring this up with McNerney. Clinton states that she illustrated the problem to McNerney with a territory map, told him about Yacu's comments about her being too old to get another job, and told him that she was being set up to fail. Clinton alleges further that after reassuring her, McNerney left the dinner table and when he came back, he said that nothing was going to be done about the problem and that he was going to make some changes. Clinton alleges that McNerney said that the territory was not big enough for two people and that there would be changes at the end of the fiscal year. McNerney denies making this statement. The plaintiff alleges that McNerney had left the table to make a phone call to Yacu.

Clinton and Hampton also met with Yacu regarding the territory situation. Clinton states that she told Yacu that there was nowhere to grow in her territory and that he replied that she did not need any money because she had two sons that were doctors and her house and everything were paid for. Yacu admits making these statements but states that the comments were made in jest.

Clinton went to Paul Fein, the Vice President of Human Resources, in February 2005. She states that she had several long conversations with Fein regarding the unfair treatment she believed she was receiving and that Yacu was behind it. She complained to Fein that she was being discriminated against for her age and gender. Regarding Yacu's comments, Fein stated that Yacu did

not deny making them but Fein believed the statements "were inappropriate, maybe not discriminatory." Ultimately, Fein found nothing "specifically discriminatory associated with age or gender relative to the realignment."

Clinton alleges that Yacu had a problem with her being an older woman. She states that she complained to Koutroubis and Davis about Yacu often bringing up her age and her gender by making cracks about her being an older woman such saying she was not able to understand how to use her laptop because she was not receiving his emails. According to the plaintiff, the whole industry placed great emphasis on youth.

At the end of the fiscal year in 2005, Clinton was laid off. Hampton and Clinton's territory was recombined and Hampton took over all of Clinton's territory.

According to Datascope, Clinton was laid off because she failed to meet her quotas. In the first fiscal quarter of 2005, Clinton only attained 87.35% of her assigned quota. In the second quarter, she only attained 76.4%. In the third quarter, only 58.1%. Conversely, Hampton attained 69.49% of his quota for the first fiscal quarter of 2005 after having just become a salesman in March 2004. However, Hampton achieved 124.1% of his quota for the second fiscal quarter of 2005 and 133.6% of his quota for the third fiscal quarter of 2005. Datascope argues that Clinton's poor sales performance is attributed to her inability to sell the new products together with her inability to maintain pre-existing business, not the reorganization of her territory.

Datascope also alleged that Clinton expressed a negative attitude to the new area manager, John Koutroubis, and the new vice-president of sales, Sean McNerney. According to McNerney, he chose to lay off Clinton primarily due to her poor sales performance combined with her negative attitude. He also laid off Tanya Daniels, a 40-year-old female, and Chris Burri, a 32-year-old male.

Datascope points out that at the time of the reorganization, 60% of their salespeople were women. Furthermore, in October 2006, three months after the plaintiff's termination, Datascope eliminated the IPD in its entirety and laid off over 75% of the employees within that Division, including Davis, Yacu, and McNerney. Hampton was one of the few sales representatives Datascope retained from the IPD and he was transferred to a different division. Hampton resigned from Datascope in January 2007.

On August 10, 2005 Clinton filed an EEOC Complaint charging Datascope with sex and age discrimination. After receiving her right-to-sue letter, Clinton filed the instant suit on March 8, 2006.

Datascope filed the instant motion for summary judgment on June 5, 2007 wherein they argue: (1) Clinton's claim that her territory was reorganized in a discriminatory manner is barred because she did not file a timely charge of discrimination given that the reorganization took place in March 2004 and she did not file her EEOC charge until August 10, 2005, well over the 180-day time limit; and (2) Clinton cannot establish age or gender discrimination regarding either the reorganization in March 2004 or the termination in June 2005 given: (a) she cannot establish a *prima facie* case of discrimination regarding the reorganization because it was not an adverse employment action and she was not treated differently than the other "similarly situated" Territory Managers within the IPD (Hampton was never a Territory Manager); (b) Datascope had a legitimate non-discriminatory reason to reorganize Clinton's territory which was based on reasonable, objective criteria applied to her entire Division; (c) Datascope had a legitimate non-discriminatory reason to terminate Clinton, 58 years old at the time, because of her poor sales figures and negative attitude while two other similarly situated employees were likewise terminated, including a 40-year-old woman and a 32-year-old man; and (d) Clinton cannot establish that these legitimate, non-

discriminatory reasons for the reorganization and termination were pretexts for age and sex discrimination given that (i) the person who allegedly discriminated against her, (ii) Yacu, was the "same actor" who hired her when Clinton was 54, (iii) Yacu never met Hampton prior to the reorganization, (iv) the plaintiff conceded that Yacu did not like Hampton better because he was younger or a male, but rather because he was a football player, (v) Clinton did not have better qualifications than Hampton given his superior sales figures, and (vi) Yacu's alleged remarks regarding the plaintiff's age were mere "stray remarks."

In response, the plaintiff argues that : (1) there are genuine issues of material fact regarding each element of the plaintiff's *prima facie* case for age and gender discrimination because: (a) the March 2004 reorganization constituted an adverse employment action given it served as a demotion and adversely affected the plaintiff's compensation; (b) the defendant does not dispute that the June 2005 termination was an adverse employment action; (c) Hampton was treated more favorably because he was younger and a male; and (d) Hampton was similarly situated because he and Clinton "filled the same function"; (2) Yacu's age related remarks constitute direct evidence of discrimination and, even if not, they are "obviously relevant" to show bias on the part of the key figure in the decision-making process, or, even if considered "stray remarks," they provide circumstantial evidence to support an inference of discrimination; (3) there are genuine issues of material fact as to whether the defendant's legitimate, non-discriminatory reasons were a pretext for age and gender discrimination because: (a) the reorganization reveals that the lucrative areas of territory were "cherry picked" in favor of Hampton; and (b) Clinton was much more qualified than Hampton such that her qualifications "leap from the record" while Hampton had no prior sales experience; (4) Datascope's wrongdoing constitutes a "continuing violation" and therefore the March

2004 reorganization survives the 180-day rule in filing the August 2005 EEOC charge; and (4) the defendant's "same actor" argument that Yacu was the same man who hired the plaintiff when she was 54 is "an evidentiary issue which requires the weighing of evidence."

## II. DISCUSSION

### A. Summary Judgment Standards

Summary judgment should be entered only if "[t]here is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment has the initial burden of demonstrating through the evidentiary materials that there is no actual dispute as to any material fact in the case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On motion for summary judgment, "[t]he inquiry performed is the threshold inquiry of determining whether there is a need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In determining whether this burden has been met, the court should view the evidence introduced and all factual inferences from that evidence in the light most favorable to the party opposing the motion. *Id*. Furthermore, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The summary judgment procedure does not authorize trial by affidavit. Rather, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or

for a directed verdict." *Anderson*, 477 U.S. at 255. Accordingly, a court may not decide any factual issues found in the record on motion for summary judgment, but if such material issues are present, the court must deny the motion and proceed to trial. *Impossible Elec. Tech. v. Wackenhut Protection Systems*, 669 F.2d 1026, 1031 (5th Cir. 1982); *Environmental Defense Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981); *Lighting Fixture & Electric Supply Co. v. Continental Ins. Co.*, 420 F.2d 1211, 1213 (5th Cir. 1969).

Under the provisions of Federal Rule of Civil Procedure 56(e), a party against whom a motion for summary judgment is made may not merely rest upon his pleadings, but must, by affidavit, or other materials as provided in Rule 56, inform the court of specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324.

Summary judgment is not proper if a dispute about a material fact is "genuine," or in other words the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248. There is no such issue unless the evidence sufficiently supports the non-moving party's version of the facts for a jury to return a verdict in the non-moving party's favor. *Id.* at 249. The relevant inquiry is whether or not there is sufficient disagreement on the facts to submit them to the jury or whether it is so one-sided that one party should prevail as a matter of law. *Id.* at 251. The issue must be genuine, and not pretended, and the evidence relied on to create such an issue must be substantial. *Southern Distributing Co. v. Southdown, Inc.*, 574 F.2d 824, 826 (5th Cir. 1978).

**B. Timeliness of EEOC Charge Regarding March 2004 Reorganization**

As discussed above, the defendant argues that the plaintiff's age and gender discrimination claims with regard to the March 2004 reorganization should be dismissed because the plaintiff failed

to file a timely EEOC charge regarding same.

"Title VII requires persons claiming discrimination to file a charge with the EEOC within 180 days after the allegedly discriminatory practice occurs." *Vadie v. Miss. State University*, 218 F.3d 365, 371 (5th Cir. 2000) (citing 42 U.S.C. § 2000e-5(e)). "The period begins to run from the time the complainant knows or reasonably should have known that the challenged act has occurred." *Id*.

It is undisputed that the plaintiff knew of the reorganization of her sales territory in March 2004. She filed her EEOC charge in August 2005, some seventeen months after the reorganization. On the other hand, that same EEOC charge was filed only ten days after her termination on June 30, 2005.

The plaintiff argues that the continuing violation doctrine acts to toll the 180-day period regarding the March 2004 reorganization, thereby rendering her August 2005 EEOC charge timely in regard to both the reorganization and her termination.

The continuing violation doctrine "has been endorsed for use by [the Fifth Circuit] under limited circumstances. The continuing violation theory relieves a plaintiff of establishing that all of the complained-of conduct occurred within the actionable period if the plaintiff can show a series of related acts, one or more of which falls within the limitations period." *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 352 (5th Cir. 2001).

With further regard to the continuing violation theory, the Fifth Circuit has written:

Although there is no definitive standard for what constitutes a continuing violation, the plaintiff seeking to invoke this doctrine must demonstrate more than a series of discrete discriminatory acts: "He must show an organized scheme leading to and including a present violation, such that it is the cumulative effect of the discriminatory practice, rather than any discrete occurrence, that gives rise to the

cause of action." ... This court has identified at least three factors that may be considered in determining if a continuing violation exists: (1) Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? (2) Are the alleged acts recurring or more in the nature of an isolated work assignment or incident? (3) Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights?

*Celestine*, 266 F.3d at 352 (internal citations omitted).

The plaintiff argues that there was indeed an "organized scheme leading to and including a present violation" because the reorganization was part of a plan instituted by David Yacu to result in Clinton's failure to meet her sales quotas thereby justifying her termination.

The defendant counters that the only evidence Clinton has of Yacu's alleged plan to terminate her is her own speculation. Although the plaintiff claims, the defendant argues, that the reorganization did not have a degree of permanence alerting her to file an EEOC charge because she thought the company would eventually listen to her and alter her territory and quotas, the plaintiff admitted that she knew the reorganization would result in the loss of her job the moment she saw the new division of her territory, citing her deposition at p. 218:5-8.

Having considered the parties' arguments, the court concludes that the continuing violation doctrine is inapplicable to the case at bar. Although the March 2004 reorganization involves the same type of alleged discrimination that the plaintiff claims resulted in her June 2005 termination, the reorganization of the plaintiff's territory, along with every other territory in her entire division throughout the country (reorganizing 40 territories into 72 company-wide), was not recurring and was more in the nature of an discrete work incident. *See Frank v. Xerox Corp.*, 347 F.3d 130, 136 (5th Cir. 2003) ("[D]iscrete actions ... are not entitled to the shelter of the continuing violation doctrine."). Furthermore, the reorganization had the degree of permanence that should have triggered

the plaintiff's awareness of and duty to assert her rights in the form of an EEOC charge given the reorganization was company-wide, thereby heavily demonstrating permanence, and given that it is undisputed that the plaintiff recognized immediately that the reorganization of sales territories could adversely affect her. *See Frank*, 347 F.3d at 136 ("[O]ne is expected to act as soon as the facts of discrimination are or should be apparent to a reasonably prudent person similarly situated.").

Accordingly, the court concludes that the plaintiff's claims of age and gender discrimination in relation to the March 2004 reorganization of sales territories within the plaintiff's division should be dismissed with prejudice for failure to file a timely EEOC charge pursuant to 42 U.S.C. § 2000e-5(e).

## C. Plaintiff's June 2005 Termination

The court now addresses the plaintiff's age and gender discrimination claims regarding her June 30, 2005 termination.

## 1. Age Discrimination

The ADEA provides in relevant part:

> It shall be unlawful for an employer – (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age ....

29 U.S.C. § 623(a).

To establish a *prima facie* case of age discrimination, the plaintiff must demonstrate (1) she was discharged; (2) she was qualified for the position; (3) she was within the protected class at the time of discharge; and (4) she was either (i) replaced by someone outside the protected class, (ii) replaced by someone younger, or (iii) otherwise discharged because of her age. *Rachid v. Jack In The*

13

*Box*, 376 F.3d 305, 311 (5th Cir. 2004). "When the employer does not plan to replace the discharged plaintiff, the fourth element is 'that after [the] discharge others who were not members of the protected class remained in similar positions.'" *Bauer v. Albemarle Corp.*, 169 F.3d 962, 966 (5th Cir. 1999).

The plaintiff was discharged on June 30, 2005, she was well qualified for her position, she was within the protected class at the time of discharge because she was over 40 years old, and she alleges that after her termination, Maruice Hampton, a 31-year-old male, remained in a similar position. Thus, the plaintiff has established a *prima facie* case of age discrimination. In their brief in support of summary judgment, the defendant states that "for the purposes of this summary judgment motion, Datascope does not contend that Plaintiff cannot establish a *prima facie* case of discrimination based upon her termination." Defendant's Brief at 19.

Upon demonstrating a *prima facie* case for age discrimination, the next stage calls for the burden to shift to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Rachid*, 376 F.3d at 312. The defendant argues that it chose to terminate the plaintiff because of her poor sales performance and her negative attitude. More specifically, the vice president of sales, Sean McNerney, was directed in June 2005 to further reduce costs. Consequently, McNerney avers that he focused on three areas of the country that had two sales representatives who lived in close proximity. McNerney determined there were three redundant areas: Memphis, Charlotte, and Phoenix. Accordingly, McNerney avers he decided to lay off one sales representative in each of these areas and to consolidate the six territories into three. In deciding whom to lay off, McNerney states that he compared the sales results of the two representatives in each of the subject areas. He compared the plaintiff to Maurice Hampton, Tanya Daniels to Dana Fisher, and Chris Burri

to Kathy Peterson. McNerney states that Datascope laid off the plaintiff, Tanya Daniels (40-year-old female), and Chris Burri (32-year-old male) because their sales figures were less than each's counterpart. That these sales representative's sales figures were lower than their counterpart's is undisputed by the plaintiff. In the case of the plaintiff and Hampton, McNerney states that he retained Hampton because his sales performance was better, his new-products sales performance was far better, and he had a positive attitude.

Thus, the defendant points out, the plaintiff was not the only one terminated and the evidence establishes that the plaintiff was not terminated due to her age or gender given that a younger female, Tanya Daniels (40), and a younger male, Chris Burri (32) were also terminated. The court concludes that the defendant has met its burden in demonstrating a legitimate, non-discriminatory reason for terminating the plaintiff.

Therefore, the burden shifts back to the plaintiff to prove that the reasons given were a pretext to discriminate against the plaintiff because of her age. The plaintiff must now offer sufficient proof "to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reasons, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motive alternative)." *Rachid*, 376 F.3d at 312.

The plaintiff's primary argument in this lawsuit is that her specific territory was reorganized in March 2004 (along with all other territories nationwide in her division) in a manner designed to deliberately lower her potential to meet her sales quotas in order to set her up for her ultimate termination in June 2005 – all in an effort to discriminate against her for her age (58) and her gender in favor of a younger (31), male sale representative, Maurice Hampton.

However, the court has concluded that any discrimination claims based on the March 2004 reorganization are barred for failure to file a timely EEOC claim. The Fifth Circuit has observed: "Any act occurring more than 180 days prior to filing 'may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history *which has no present legal consequences*.'" *Merrill v. Southern Methodist University*, 806 F.2d 600, 604 (5th Cir. 1986) (quoting *United Air Lines vs. Evans*, 97 S.Ct. 1885, 1888 (1977)) (emphasis added).

An issue that arises, therefore, is whether evidence of the March 2004 reorganization used in support of the June 2005 termination, if considered by the court and ultimately during trial, will have "present legal consequences" as prohibited by *United Air Lines* and *Merrill*.

The primary evidence the plaintiff urges supports her allegedly discriminatory discharge in June 2005 is the manner in which her sales territory was reorganized in March 2004. Thus, the illegality of the termination event rests heavily upon the illegality of the reorganization. Stated differently, because of the alleged discriminatory reorganization, the plaintiff alleges she was set up to fail in her sales quotas thereby leading to her termination. But any claims based on the reorganization are barred as untimely. If evidence of the reorganization were allowed as mere "relevant background evidence" to support the discriminatory termination claim, such evidence would indeed have "present legal consequences" since it is essentially undisputed that the defendant's non-discriminatory reason for the termination was legitimate in the sense that the plaintiff does not deny that her sales figures were significantly lower than Hampton's and that in three groups of two sales representatives compared with each other, she was one among three sale representatives laid off for lower quotas than his or her counterpart. Furthermore, it is significant that

16

the aforementioned three similarly situated sales representatives laid off were the plaintiff, a 58-year-old female, a 40-year old female, and a 32-year-old male.

The legal and practical consequences of allowing evidence of discriminatory acts before February 11, 2005 (180 days before the filing of her EEOC charge on August 10, 2005), especially evidence of the alleged discriminatory reorganization, would have "present legal consequences" taking the form of the discriminatory predicate to the termination. That is, but for the reorganization, the termination would probably not have taken place, and since claims based on the reorganization are barred, allowing evidence of the reorganization as background evidence to support the alleged discriminatory nature of the termination would essentially circumvent the requirement that the plaintiff have filed a timely EEOC charged based on the reorganization.

Although the alleged discriminatory nature of the termination rests heavily upon the alleged discriminatory nature of the reorganization, this fact does not connect the two actions to form a continuing violation. As discussed above, the reorganization was a discrete employment action, the adverse nature of which the plaintiff readily admits she knew the moment she saw the reorganization in March 2004 and about which she complained to management for the following fifteen months.

For these reasons, the court concludes that it will not admit evidence of the alleged discriminatory affect on the plaintiff of the March 2004 reorganization for any reason. Any claims based on that event are barred as untimely. If evidence of the reorganization is allowed, even as mere background evidence, it would have impermissible present legal consequences because it is the primary basis for the alleged illegality of the plaintiff's June 2005 termination. In other words, if claims based on the reorganization are barred, but the plaintiff is allowed to use that evidence as the

17

primary support for her termination claim, then she would effectively be recovering for the reorganization.

The court now turns the remainder of evidence supporting the plaintiff's claim of age discrimination with regard to her June 2005 termination. Other than the nature of the March 2004 reorganization, the plaintiff alleges that she was far more qualified than Hampton and Yacu's age-related remarks evince his discriminatory animus towards her.

With regard to the plaintiff's argument that discrimination can be inferred from her superior qualifications, it is undisputed that when Hampton was promoted from a Clinical to a sales representative, he had no prior sales experience. However, it is also undisputed that he had better sales figures than the plaintiff when she was terminated, as was the case with the other two sales representatives (the 40-year-old female, and 32-year-old male) who were laid off for lower sales figures than their counterparts.

As to Yacu's comments, it is undisputed that Yacu played no role in the termination. Rather, the vice-president of sales, McNerney, chose to lay off the plaintiff, in addition to two other sales representatives, one of whom was a 40-year-old female and the other a 32-year-old male. Furthermore, even if the Yacu's comments were made, they were "stray remarks" given he was not involved in the decision to lay off the plaintiff, and Yacu was the "same actor" who hired the plaintiff when she was 54.

The discriminatory comments attributed to Yacu include: (1) that the plaintiff did not need to work because her sons were both doctors and could support her; (2) the plaintiff would not quit upon learning of the reorganization because she was too old to start another job; (3) the plaintiff did

not know how to use a computer; (4) the plaintiff was late to a meeting because she got lost; and (5) the plaintiff's statement that Yacu looked good was just as bad as Yacu referring to the plaintiff's age. Stray remarks do not demonstrate age discrimination. *EEOC v. Texas Instruments, Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996). "In order for an age-based comment to be probative of an employer's discriminatory intent, it must be direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions that age was an impermissible factor in the decision to terminate the employee." *Id*. "[F]or comments in the workplace to provide sufficient evidence of discrimination, they must be (1) related [to the protected class of persons of which plaintiff is a member]; (2) proximate in time to the termination; (3) made by an individual with authority over the employment decision at issue; and (4) related to the employment decision at issue." *Krystek v. Univ. of So. Mississippi*, 164 F.3d 251, 256 (5th Cir. 1999).

The Fifth Circuit has recognized and adopted the "same actor" inference which is based on the reasoning that "'[c]laims that employer animus exists in termination but not in hiring seem irrational.' From the standpoint of the putative discriminator, '[i]t hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job.'" *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir. 1996) (quoting *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991)). In this case, Yacu hired the plaintiff when she was 54 and she was terminated when she was 58.

The court concludes that Yacu's comments were "stray remarks" because comments 1, 3, and 4 were not directly and unambiguously age or gender related. Comments 2 and 5, though age-related, are stray remarks because they were not made by the person who decided to lay off the plaintiff and they were not related to the plaintiff's June 2005 termination. Furthermore, the inference of Yacu's

animus against the plaintiff with regard to all of Yacu's comments are vitiated by the fact he was the same person who hired her when she was 54.

The court concludes that even after viewing the facts in a light most favorable to her as the non-movant, the plaintiff has not demonstrated any genuine issues of material fact warranting a trial on her age discrimination claim.

## 2. Gender Discrimination

The standards for, and evidence presented to support, the plaintiff's gender discrimination claim pursuant to Title VII are essentially identical to her age discrimination claim. The court concludes that its analysis regarding her age discrimination claim applies equally to her gender discrimination claim. Therefore, the court concludes that the plaintiff has not presented sufficient evidence to create a genuine issue of material fact to necessitate a trial and to thereby survive summary judgment.

### III. CONCLUSION

For the reasons discussed above, Defendant's Motion for Summary Judgment [44-1] should be granted and the plaintiff's claims against the defendant should be dismissed with prejudice. Accordingly, a Final Judgment shall issue forthwith,

**THIS DAY** of July 6, 2007.

/s/ W. Allen Pepper, Jr.
W. ALLEN PEPPER, JR.
UNITED STATES DISTRICT JUDGE